No. 42,498

The State of Kansas, ex rel. Keaton G. Duckworth, County Attorney of Morton County, Kansas, *Plaintiff*, v. The Board of County Commissioners of Morton County, Kansas; Ivan Mills, Chairman; Roscoe Thompson, Commissioner; Jess Davison, Commissioner; and Lyndell Vail, County Clerk, *Defendants*.

(362 P. 2d 81)

Opinion filed May 24, 1961.

*Keaton G. Duckworth,* county attorney, argued the cause, and *Shelley Graybill* and *Edgar W. White,* both of Elkhart, and *William A. Smith,* of Topeka, were with him on the briefs for the plaintiff.

*Charles Vance,* of Liberal, argued the cause, and *H. Hobble, Jr., Chester A. Nordling,* and *Gene H. Sharp,* all of Liberal, were with him on the briefs for the defendants.

The opinion of the court was delivered by

Robb, J.: This is an original proceeding in mandamus to compel the board of county commissioners of Morton county to proclaim Elkhart to be the county seat pursuant to an election held on January 24, 1961.

Since there is no dispute in regard to the holding of the election, the issuance of the alternative writ by this court, or the defendants' return in response thereto, we shall refer only to such parts thereof as are necessary for determination of the issue before us.

Did 449 "no" votes cast in opposition to 1,060 "yes" votes result in a sufficient plurality to relocate the county seat of Morton county

from Richfield to Elkhart? The board, by a vote of two to one, concluded the plurality was not sufficient and ordered the county seat to remain at Richfield. Hence this application for a writ of mandamus, and for costs, and attorney fees on the grounds that the board's finding, proclamation and order that the county seat remain at Richfield was illegal, arbitrary, capricious, without foundation in fact or in law and therefore void.

It is admitted the population of Morton county is 3,317; that the register of electors eligible to vote under G. S. 1949, 19-1613 and 19-1614 consisted of 1,873 names and the number of legal electors of Morton county was 1,873. The record shows, and it is admitted that, on January 28, 1961, defendants canvassed the vote of the special election held on January 24, 1961, and found:

"(1) That there were 1060 relocation ballots marked 'yes' and 449 relocation ballots marked 'no'."

However, on January 30, 1961, the board concluded the foregoing was not a sufficient vote of the legal electors of Morton county to relocate the county seat.

This is the fifth occasion in the last thirty-six years the dispute over the relocation of the Morton county seat has been before this court. The four previous cases were: *State, ex rel., v. Russell,* 119 Kan. 266, 237 Pac. 877, (1925); *State v. Morton County Comm'rs,* 121 Kan. 191, 246 Pac. 504, (1926); *Dunn v. Morton County Comm'rs,* 162 Kan. 449, 177 P. 2d 207, (1947); *Dunn v. Board of County Comm'rs of Morton County,* 165 Kan. 314, 194 P. 2d 924, (1948).

The constitution of the state of Kansas, article 9, section 1, reads:

"The legislature shall provide for organizing new counties, locating county seats, and changing county lines; but no county seat shall be changed without the consent of a majority of the electors of the county. . . ."

The pertinent portion of G. S. 1949, 19-1602 which governs the relocation of the county seat of any county with the population of Morton county reads:

". . . *Provided further,* That in any county having a population of not less than three thousand nor more than thirty-four hundred and fifty people, according to the last preceding census taken by the several assessors of said county, the board of county commissioners shall, upon the petition of one-half of the legal electors of such county, order an election for the relocation of the county seat of any such county, and it shall require a majority of three-fifths of the votes of legal electors cast at such election to relocate the county seat thereof, and to move it from such place. . . ."

In the Russell case, supra, the identical proviso of the statute (then Chap. 134, § 1, Laws of 1925) was applicable to Morton county because its population was between 3,000 and 3,450. The decision of this court was that the statute was general and therefore constitutional so far as it concerned section 17, article 2, of the state constitution (syl. ¶ 1) and the court directed the proper assessment rolls which the county commissioners should use in determining and verifying the sufficiency of the petitions therein concerned.

In *State v. Morton County Comm'rs,* supra, upon the report of a commissioner appointed by this court, the writ of mandamus sought in the Russell case was allowed, and the county commissioners were thereby directed to hold the election.

The first Dunn case, supra, was an appeal in an injunction action to enjoin an election to relocate the Morton county seat and this court merely decided the plaintiff therein did not possess the requisite legal capacity to bring the action and directed the trial court accordingly.

The second Dunn case, supra, was another appeal in an injunction action to enjoin the removal of the Morton county seat from Richfield to Elkhart but a difference of population, as was true in the first Dunn case, invoked the application of that part of G. S. 1949, 19-1602 which, in substance, states that in counties having more than 2,000 population with at least $10,000 of county buildings at a county seat that has been the county seat for eight or more consecutive years,

". . . it shall require a vote of *three-fifths of the legal electors* of such county to relocate the county seat and to remove it from such place. . . ." (Our emphasis.)

Under this statute the court in the second Dunn case held that the words "legal electors" meant persons entitled to vote, and three-fifths of the valid votes cast was not sufficient to carry a proposal to relocate the county seat unless it was also three-fifths of the legal electors.

The second Dunn case contains a complete analysis and explanation of how the register which reflects the number of legal electors is established and any interested reader is referred to that opinion, which, in part, stated:

"Appellants contend that it is sufficient if three-fifths of the votes lawfully cast favor the proposition. Under that view the meaning of the statute would

be construed as though it read 'three-fifths of the *votes lawfully cast.*' But the statute says 'three-fifths of the *legal electors* of the county.'" (p. 323.)

The same opinion further stated:

"Under the findings hereinafter noted either by the board which ordered removal, or by the trial court which enjoined removal of the county seat, appellants can prevail only by a construction of the statute which makes three-fifths of the votes cast equivalent to three-fifths of the legal electors of the county. We cannot adopt that construction." (p. 326.)

The statutory provision applicable here differs from the one that controlled the second Dunn case by reason of a change in the population of Morton county so that the majority of three-fifths of the votes of legal electors cast at such special election was sufficient to relocate the county seat and remove it to Elkhart from Richfield. We are mindful of defendants' contention that while our present facts and circumstances do not present a situation where three-fifths of the votes cast contravenes the provision of article 9, section 1, of our state constitution referring to the *consent of a majority,* there might arise a set of facts and circumstances which would cause this provision of 19-1602 to be unconstitutional because the number required under such interpretation might be less than a majority of the legal electors; that we should herein apply the interpretation that three-fifths means three-fifths of the legal electors of such county, and not three-fifths of the votes of legal electors *cast* at such election. To follow this suggestion based on such speculative circumstances would require us to ignore the word *cast* and this, of course, we cannot do. We need not prolong this opinion with a lengthy discourse on the presumption of constitutionality of a statute but in this connection see *State, ex rel., v. School District,* 163 Kan. 650, 661, 185 P. 2d 677, where the rule is restated thus:

"Constitutionality of a statute is presumed. If its language is ambiguous, it is to be interpreted as constitutional rather than as unconstitutional." (Syl. ¶ 4.)

We have examined other contentions, arguments and authorities presented by the parties but think it is unnecessary to determine them in view of what has heretofore been said. The request for attorney fees is denied.

Summarizing, we conclude the 1,060 "yes" votes cast by the legal electors to relocate the county seat of Morton county and remove it to Elkhart from Richfield was in excess of a simple majority of the legal electors and was also in excess of a three-fifths majority of the legal electors who cast votes at the election. This compels the issu-

ance of the peremptory writ sought by plaintiff and a direction to the defendants to remove the county seat from Richfield, Kansas, to Elkhart, Kansas. (G. S. 1949, 19-1609.)

The writ is allowed.